824

**HEARST MAGAZINES, DIVISION OF
the HEARST CORPORATION
and
Employers' Liability Assurance Corp.
v.
The CUNEO EASTERN PRESS, INC.
OF PENNSYLVANIA.**

Civ. A. No. 35433.

United States District Court
E. D. Pennsylvania.

Nov. 22, 1968.

Eugene H. Feldman, Arnold H. Winicov, Philadelphia, Pa., for plaintiffs.

Edward W. Madeira, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

WOOD, District Judge.

### FINDINGS OF FACT

1. Since 1919 Hearst and Cuneo have been parties to a contractual relationship whereby Hearst delivered its paper to Cuneo for printing.

2. Pursuant to said contractual relationship and since the acquisition of its present facility in North Philadelphia in 1932, Cuneo has stored in its warehouse for varying periods of time Hearst paper prior to printing.

3. Hearst and Cuneo entered into a formal contractual arrangement in an agreement dated May 21, 1935.

4. Thereafter the parties made a number of modifications and amendments of the original contract; among these modifications and amendments was one dated March 5, 1947, providing inter alia that:

"2. All the terms, conditions and practices of the aforesaid contract dated May 21, 1935 as thereafter modified and amended, shall remain in full force and effect, except as hereinafter modified." (Plaintiff's Exhibit 8)

5. The following letter was sent to Cuneo from Hearst dated November 5, 1954:

"Gentlemen:

In accordance with our recent conversation and your letter of October 22nd, we wish to state that all property owned by us, which is in use or otherwise stored in your main plant at Erie Avenue, F and G Streets in Philadelphia, is separately insured by us against loss or damage from fire, sprinkler leakage and other commonly insured risks, with the exception or paper stored in your press rooms, which is covered only against fire and sprinkler leakage damage.

You may therefore exclude such coverage for all our property on your policy which covers your plant.

Very truly yours,

HEARST MAGAZINES DIVISION
The Hearst Corporation
(signature)
E. C. CORLAND
Ass't Chief Accountant"

(Defendant's Exhibit 1)

6. Since December 1954, Cuneo has excluded the said Hearst paper from coverage under its policy of insurance (N.T. 5–6).

7. The paper in question in this action was stored in warehouses A and E of the Cuneo plant at Erie Avenue, F and G Streets, Philadelphia.

8. In August 1962, Cuneo stored Hearst's rolls of paper end-on-end on 1½" dunnage under the bottom rolls. (N.T. 43) "Dunnage" consists of 2" x 8" planks of wood placed on the floor of the Cuneo plant prior to putting the paper on top.

9. Storage of the paper on dunnage at a height of greater than 1½" would have been unsafe because of resulting instability and increased fire hazard. (N.T. 47)

10. Approximately once per year representatives of Hearst and Employers' Liability Assurance Corp. inspected the warehouses where the paper was stored. (N.T. 47)

11. Prior to August 1962, no moisture or flooding had occurred in the Cuneo warehouse above the level of such dunnage. (N.T. 45)

12. The following weather forecast was published in The Philadelphia Inquirer on Monday morning, August 27, 1962:

"Philadelphia and vicinity: Mostly fair Monday except for early-morning cloudiness and fog. High in low 80's. Cloudy Tuesday with little temperature change and chance of showers. Southeasterly winds six to twelve miles an hour Monday."

(N.T. 122); Exhibit D–20–23)

13. On August 27 and 28, 1962, the Water Department of the City of Philadelphia made the following rainfall measurements at its measuring stations in the vicinity of the Cuneo plant:

| | Began August 27 | Ended August 28 | Depth | $I_{10}$ * |
|---|---|---|---|---|
| PTC Dept. (No. 16) Comly Road & Bustleton Ave. | 11:00 P.M. (EDT) | 5:30 A.M. (EDT) | 3.80 in. | 7.80 in./ hr. |
| Heintz (No. 8) Front Street & Olney Ave. | 10:50 P.M. (EDT) | 4:55 A.M. (EDT) | 4.25 in. | 9.60 in./ hr. |
| Naval Supply (No. 11) Tabor Rd. & Alcott St. | 10:55 P.M. (EDT) | 5:00 A.M. (EDT) | 3.10 in. | 8.40 in./ hr. |
| Northeast High School (No. 13) Algon Ave. & Glendale Ave. | 10:40 P.M. (EDT) | 5:00 A.M. (EDT) | 3.90 in. | 7.20 in./ hr. |

14. The Heintz station is located at Front Street and Olney Avenue in Philadelphia, approximately two miles from the Cuneo warehouses.

15. The rainfall recorded at the Heintz station was the second highest rainfall in a six-hour period in the available recorded history of the United States Weather Bureau in Philadelphia and the highest in 64 years. (N.T. 134–8)

16. Such an amount of rainfall in a six-hour period is meteorologically probable in Philadelphia about once in one-

* $I_{10}$ is a recognized meteorological symbol for the intensity of rain in a ten-minute period translated to an hourly rate. (N.T. 127)

hundred years. Rainfall at the rate of 9.6 inches per hour over a ten-minute period would be expected in Philadelphia about once every two-hundred years. (N.T. 136)

17. One consequence of this rainfall was flooding in the area of the Cuneo plant to the extent that water accumulated to a depth of approximately six inches on the floors of the warehouses where Hearst's paper rolls were stored; as well as on the floors of other Cuneo facilities.

18. In the ten-block area surrounding the Cuneo warehouse at F and G Streets and Erie Avenue, there was flooding in the streets, and sewers were backed up. (N.T. 107)

19. Water was also backed up and sewers flooded on Erie Avenue. A considerable amount of this water was flowing from Erie Avenue downhill to the main loading entrance of Warehouse A. (N.T. 107)

20. As a result of this flooding, water rose above the 1½" dunnage in Cuneo warehouses A and E; thereby damaging 430 rolls of paper owned by Hearst. Approximately two-thirds of the paper damaged was stored in Warehouse A, and the remainder of the paper that was damaged had been located in Warehouse E. (N.T. 59, 64, 113)

21. The 430 rolls of paper that were damaged weighed 986,784 pounds and cost $109,450.00.

22. Cuneo identified and segregated the damaged rolls in a reasonable manner.

23. Disposition of the said rolls of paper was made by the plaintiffs through Underwriters Salvage Company, and Cuneo was paid $895.00 by Hearst on or about February 28, 1963, for handling the damaged paper.

24. Upon claim by Hearst, Employers' paid to Hearst the sum of $110,176.-52 on or about December 26, 1962, under policy #T9 29 35 and acquired title to the damaged paper as evidenced by Joint Exhibit 6, an authentic copy of a loan receipt dated May 11, 1964.

25. Employers' received $22,092.29 from Underwriters Salvage Company for salvage of the damaged paper.

26. Underwriters Salvage Company sold the paper on behalf of Employers to G. B. Goldman Co. for $24,669.50 and retained $2,577.21 as its commission.

## DISCUSSION

Trial and argument of this action centered upon two issues: The nature of the legal relationship between the parties and the duties flowing therefrom, and whether Cuneo was negligent with regard to damage to Hearst's paper stored in the Cuneo plant. Plaintiffs urge that the relationship under which Cuneo stored Hearst's paper prior to printing was a mutual benefit bailment, and that Cuneo was negligent in permitting water damage to Hearst's paper. The defendant Cuneo, denies any negligence in its storage of paper, or in its efforts to mitigate the effects of flooding. Further, Cuneo urges that even if it is found negligent, it is not liable to Hearst (or its subrogee Employers' Liability Assurance Corp.) because Hearst had by contract and conduct assumed the risk of the loss of the paper.

After a thorough examination of the record, we hold that Cuneo was not negligent in any respect in connection with the damage done to Hearst's paper, and that under these circumstances Hearst is not entitled to recovery under any theory of law urged upon us.

Plaintiffs have cited to us three respects in which they consider Cuneo to have been negligent:

"The testimony of the defendant's own witness, White, shows that he never ordered the door through which all the water was entering Warehouse A, to be closed. Further that the drains in the floor were not working, and that an insufficient number of pumps were being used." (Plaintiff's Brief in Support of Request for Findings of Fact and Conclusions of Law, p. 12)

These suggestions are not supported by the evidence presented to us. As to the overhead door in the entrance to Warehouse A, apparently the greatest amount of water was entering the building through this door space, but there were other means by which water could enter Warehouse A. More significantly, closing the overhead door would not have stopped water from entering the warehouse because the door only came down to the cement and the tracks are receded from the cement. As to the drains in the warehouses, the witnesses before us could not state from their own knowledge whether the drains were clogged or overflowing. We believe, however, in consideration of all the testimony, that the drains were overflowing because of the unexpected and extraordinary amount of rain that fell on the morning of the 28th. The drains were cleaned about once per month, which we consider reasonable under the circumstances. There was apparently some incidental refuse scattered on the floor, but it must have been insignificant in both amount and effect when compared with rainfall of deluge proportions. The same flooding occurred in areas in the vicinity of the plant where no such refuse was present: Streets in the area of the warehouses were flooded, and sewers were overflowing. As to the pumps, the uncontradicted testimony of Mr. White was that only one pump was being used because there were no hoses long enough to make other available pumps effective. Efforts were promptly made to procure workable equipment from other sources.

Nor do we find anything negligent in Cuneo's arrangements for storage of paper, or for drainage of water. This was the first recorded instance of damage from flooding to paper stored at Cuneo's plant. The 1½" dunnage, the drains, and other drainage facilities had been sufficient to prevent water damage by flooding on all previous occasions. Indeed, representatives of Hearst and Employers' inspected the storage arrangements about once a year, and there is no evidence that either ever objected to the arrangements for storage of Hearst's paper.

We conclude that there was obviously only one significant cause of the damage done to Hearst's paper: A sudden and unexpected cloudburst of almost unprecedented intensity. The records of The Water Department of the City of Philadelphia show that between 10:50 P.M. on August 27, and 4:55 A.M. on August 28, 4.25 inches of rain fell in the vicinity of the Cuneo warehouse. At one point during this time, rain fell in a ten-minute period at an intensity of 9.60 inches per hour. There had been no water damage to paper stored in the Cuneo plant prior to or since the event here in question. Taking into consideration the location of the plant, the placement of the paper, and other circumstances in the record of this case, we are convinced that the sudden rainstorm in the early morning of August 28 simply deluged the Cuneo warehouses with water. Provisions adequate in the past under ordinary circumstances to prevent water from reaching the paper were not sufficient to cope with the surprise flooding caused by this nearly unprecedented storm. We see no evidence to suggest that Cuneo should have expected a storm of such magnitude or intensity; indeed, the evidence of weather forecasts in the record suggests that not even moderate precipitation was anticipated during this period.

As we have stated previously, since we do not find Cuneo to have been negligent in any respect, we do not believe that the plaintiffs can recover under any theory urged upon us in this case. Although we think that this finding is sufficient in itself to deny recovery to the plaintiffs, we will discuss the other questions raised in order to complete the record.

Plaintiff apparently had little or no evidence of negligence on the part of Cuneo in advance of trial, and at trial sought to shift the procedural burden of going forward to Cuneo by establishing that the relation between Hearst and

Cuneo with respect to the paper was a mutual benefit bailment. Plaintiff contended that Cuneo was a bailee of the paper stored in its plant and that a bailor makes out a prima facie case against the bailee by showing delivery of personalty to the bailee and the failure of the bailee to redeliver it in the same condition received. Once the bailor has made out the aforesaid case, "the burden of going forward with the evidence to exculpate himself from liability is upon the bailee." (Plaintiff's Brief in Support of Request for Findings of Fact and Conclusions of Law, p. 12) At trial, after showing delivery and failure to return in original condition, plaintiff rested, thereby seeking to throw the burden of going forward upon the defendant. The defendant, Cuneo, did go forward, but maintained at the same time that it was not compelled to, because, it asserted, the relationship between the parties with respect to risk of loss of the parties was governed by contractual agreement rather than the law of bailment.

■■■ We believe, for reasons to be discussed at a later point, that the relation between the parties was governed by the terms of the contract with respect to the paper, and therefore plaintiff was not in any event entitled to whatever procedural benefits he sought from showing a mutual benefit bailment. But even if we were to hold that the relation of the parties was a mutual benefit bailment, it is difficult to envision how plaintiff's cause would be helped. For, once the bailor has made out the prima facie case,

> "* * * It then becomes the bailee's duty, if he would escape responsibility for the loss of the bailed article, to show that his failure to redeliver it upon the termination of the bailment was because of its loss by fire, theft or other casualty free from fault on his own part. With that done, the burden of going forward with evidence to prove that the loss was due to the bailee's negligence is then upon the bailor. * * * "

Moss v. Bailey Sales and Service, Inc., 385 Pa. 547, 550, 551, 123 A.2d 425, 426 (1956).

Cuneo did show that its failure to redeliver was due to casualty free from fault on its own part, and therefore the burden of going forward with evidence shifted back to the plaintiff. Of course the burden of proof remained with the plaintiff throughout. And even assuming that the plaintiff had successfully shown a mutual benefit bailment, the law in that circumstance requires only reasonable and ordinary care or diligence on the part of the bailee and makes him responsible for ordinary neglect. See 5 Pennsylvania Law Encyclopedia § 13 Bailment, and cases there cited. Plaintiff's case would founder on these shoals as well because of our finding of no negligence on the part of Cuneo.

Finally, the defendant, Cuneo, urged upon us as an alternate ground of decision that a practice existed between Hearst and Cuneo whereby Hearst assumed the risk of loss of the paper, regardless of negligence, and that such practices constituted a term of the formal contract between the parties. Cuneo asserts that Hearst's letter of November 5, 1954 was a "practice" encompassed in the modification and amendment dated March 5, 1947, and in turn the original contract of May 21, 1935. Cuneo then asked us to follow a recent line of cases holding that in commercial agreements between two business concerns a provision that one will maintain insurance against certain risks indicates an intention to grant immunity to the other from liability, even though loss is caused by the negligence of the other. See Mayfair Fabrics v. Henley, 97 N.J.Super. 116, 234 A.2d 503 (1967); Monsanto Chemical Co. v. American Bitumuls Co., 249 S.W.2d 428 (Mo.Super.Ct.1952) and an older leading case, Newport News Shipbuilding and Dry Dock Co. v. United States, 34 F.2d 100 (4th Cir. 1929). On the other hand, Hearst has maintained that the letter of November 5, 1954, was not part of the formal contractual relationship but rather a mere "unilateral

promise that cannot be enforced at law." Hearst further maintains that the formal contract between the parties was unambiguous and fully integrated, and therefore parole evidence was not admissible to explain the meaning of "practices" in the 1947 letter.

■ We agree with Cuneo that the practice reflected in the letter of November 5, 1954, of Hearst insuring its paper stored in the Cuneo plant was a term of the ongoing contractual relationship of the parties founded on the original written contract dated May 21, 1935. Although there was no explicit provision in the formal contract to insure the paper, we considered the word "practices" in the March 5, 1947, modification ambiguous and heard testimony on its meaning. This testimony [1] showed that there were many operations in the course of the long-standing and extensive contractual relationship "which are agreed to verbally that the parties follow month after month and year after year as accepted procedure under the contract." [2] It would be impractical to detail all of these terms in the written contract, and we think that the parties intended them to be a part of their contract and employed the word "practices" to encompass them. The practice whereby Hearst insured its paper located in the Cuneo plant is not inconsistent with the formal contract of the parties.

■ Even if the practice of Hearst's insuring its paper in Cuneo's plant were not considered a part of the formal contract, we think that the parties intended to be bound and that the agreement could be considered as an independent contract to provide for storage of Hearst's paper, with Hearst assuming risk of loss. Alternatively, we think that Hearst's letter of November 5, 1954 should create an estoppel on Hearst. In that letter Hearst stated that it would insure the paper and that Cuneo would "therefore exclude such coverage for all our (i. e. Hearst's) property on your policy which covers your plant." (Exhibit P–1) The intent of such a letter is clearly to invite Cuneo to rely by discontinuing any insurance against potential loss on Hearst's paper.

We therefore conclude that the risk of loss of the Hearst paper was assumed by Hearst and that Cuneo cannot be held liable for its loss, at least in the absence of negligence on the part of Cuneo. Because we find no negligence on the part of Cuneo, we do not reach the question of whether under the contract before us risk of loss was assumed by Hearst even if Cuneo were found negligent.

Accordingly, we make the following conclusions of law:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties to this action.

2. This Court has jurisdiction over the subject matter of this action.

3. Cuneo was not negligent in any respect with regard to the damage done to Hearst's paper as a result of flooding during the storm of August 27 and 28, 1962.

4. The relationship between Hearst and Cuneo with regard to insurance and risk of loss is governed by their contract, a term of which was the letter of November 5, 1954, and not by the law of bailment.

5. Pursuant to the said contractual relationship, Hearst assumed the risk of loss of the paper concerned in this action, at least in the absence of negligence on the part of Cuneo.

6. Cuneo has no liability for the loss resulting from the damage to the rolls of paper.

## ORDER

And now, this 22nd day of November, 1968, it is ordered that verdict is entered in favor of Cuneo and the Clerk is directed to enter judgment thereon.

1. See, for instance, n.t. 160 et seq.; n.t. 205 et seq.

2. n.t. 205.