**AVIATION ASSOCIATES OF PUERTO RICO, Plaintiff,**

v.

**The DIXON COMPANY, Inc., et al., Defendants.**

**Civ. A. No. 68–123.**

United States District Court, M. D. Pennsylvania.

Nov. 19, 1971.

---

Company. Plaintiff was a Puerto Rican Company and the new plane was at the Piper factory in Florida. Plaintiff needed a pilot to fly the plane to Puerto Rico and made arrangements with the Dixon Company, Inc., located in Williamsport, Pennsylvania, to have the plane delivered. The Dixon Company engaged for the job a pilot named Harry Johnson who picked up the plane at the Piper factory. Accompanied by the daughter, son-in-law and three young grandchildren of the President of the Dixon Company, Johnson set out for Puerto Rico. The plane ran out of fuel, was ditched, and sank in the Atlantic Ocean.

## II. FINDINGS OF FACT

1. The matter in controversy exceeds, exclusive of interest and costs, the sum of ten thousand ($10,000.00) dollars.

2. Aviation Associates of Puerto Rico, plaintiff, is a corporation which at the time of the institution of this suit was organized under the laws of Puerto Rico with its principal place of business at San Juan, Puerto Rico.

3. The Dixon Company, Inc., a defendant, is a corporation organized under the laws of Pennsylvania which at the time of the institution of this suit had its principal place of business at R.D. #2, Williamsport, Pennsylvania.

4. At the time this suit was instituted, James Wolyneic, Sr. and Joyce Wolyneic, the other defendants, were husband and wife and resided at R.D. #2, Williamsport, Pennsylvania.

Candor, Youngman, Gibson & Gault, Williamsport, Pa., for plaintiff.

Greevy, Knittle & Mitchell, Wiliamsport, Pa., for defendants.

MUIR, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

In 1967, plaintiff purchased a new Piper aircraft from the Piper Aircraft

5. Joyce Wolyneic is the daughter of John Dixon, President of the Dixon Company, Inc.

6. On March 4, 1967, plaintiff owned a 1967 Piper aircraft, PA 32–300.

7. The fair market value of the Piper aircraft at that time was $18,389.84.

8. On March 4, 1967, the Piper aircraft had not yet been delivered to plaintiff in Puerto Rico from the Piper factory in Vero Beach, Florida.

9. In 1967, the Dixon Company was in the business of delivering aircraft to customers of Piper Aircraft Corporation, among others.

10. On or before March 4, 1967, plaintiff entered into an oral agreement via telephone with defendant Dixon Company for the delivery of the above plane to Puerto Rico from Florida for a fee and this oral contract was never reduced to writing.

11. There was no standing written agreement between the parties relating to delivery of the aircraft by the defendant Dixon Co. for the plaintiff.

12. The usual arrangement between plaintiff and the Dixon Company with respect to other aircraft was that the Dixon Company would either have the planes delivered to plaintiff by its own personnel or obtain other pilots to make the deliveries.

13. Pursuant to the usual arrangement, plaintiff would in each case pay the Dixon Company a fee for the delivery of a particular plane.

14. Dixon Company would either have its president, John Dixon, deliver the plane or would hire another pilot to make the delivery, in which event the pilot was paid a smaller fee by defendant Dixon Company than the latter received from the plaintiff for the delivery.

15. In the ordinary case, the fee paid a pilot other than John Dixon would be agreed upon by the Dixon Company and the pilot.

16. Plaintiff had no control over the fee paid any pilot by the Dixon Company.

17. The usual arrangement described in paragraphs 11 to 16, supra, was in effect for delivery of the Piper plane in this case.

18. On or before March 4, 1967, the Dixon Company arranged to have Harry J. Johnson deliver the Piper plane in question from Vero Beach, Florida, to the plaintiff at San Juan, Puerto Rico.

19. Johnson took delivery of the plane at the Piper factory in Vero Beach, Florida.

20. Johnson was permitted to take delivery because Piper officials knew (1) that the Dixon Company was authorized to take delivery of this particular plane and (2) that Johnson delivered planes for Dixon.

21. When leaving Fort Lauderdale, pilot Johnson had fuel sufficient to last about six hours under normal conditions.

22. Johnson's first stop on his way from Fort Lauderdale to San Juan was scheduled to be the island of South Caicos.

23. South Caicos is about five hours and fifteen minutes flying time from Fort Lauderdale with this type of Piper plane.

24. South Caicos is one of a chain of islands.

25. It is possible to reach South Caicos from Fort Lauderdale via Nassau.

26. Nassau is about one hundred seventy-five miles and ninety minutes flying time with this plane down range from Fort Landerdale.

27. The plane could have been refueled at Nassau.

28. The plane was ditched in the Atlantic Ocean approximately five hours and twenty minutes after takeoff on March 5, 1967.

29. When ditched, there was some fuel remaining in the plane's tanks.

30. Visual reference, a Visual Omni Range and a compass were the only means of navigation on this flight.

31. A Visual Omni Range provides an electronic means of maintaining contact with land stations for a range of about forty to one hundred thirty miles depending on the altitude.

32. Johnson was confronted with cloud coverage about halfway to South Caicos.

33. When confronted with cloud coverage, Johnson continued on towards South Caicos.

34. By continuing the flight towards South Caicos, Johnson lost contact with the land.

35. At the time Johnson lost contact with the land he was beyond the range of the Visual Omni-range instrument.

36. Having lost contact with the land, and being beyond the range of the Visual Omni Range instrument, Johnson was left with no means of navigation other than a compass.

37. Had Johnson reversed his course instead of continuing on towards South Caicos he could have regained visual or Visual Omni Range contact with island chains, descended and maintained low level visual contact the rest of the way.

38. Prior to the flight in question, James Wolyneic called Harry Johnson and made arrangements to meet him at Fort Lauderdale.

39. James Wolyneic wished to fly to San Juan with Johnson and to take his wife and three small children with him.

40. James Wolyneic agreed to pay a part of the fuel cost.

41. James Wolyneic rented a life raft to take along on the flight as a safety measure.

42. Johnson had planned on leaving Fort Lauderdale on a Monday.

43. James Wolyneic requested that they leave on the preceding day.

44. The plane left for San Juan on that preceding day as requested by James Wolyneic.

45. James and Joyce Wolyneic did not want to stop at Nassau overnight but expressed no opposition to stopping at Nassau for refueling.

46. At the time of this flight, James Wolyneic was a student pilot.

47. Harry Johnson was not a certified flight instructor at the time of the flight.

48. James Wolyneic flew the plane between thirty and forty-five minutes.

49. While Wolyneic was flying the plane, Johnson was supervising Wolyneic's performance.

50. Johnson was always in control of the plane on the flight.

51. According to Civil Aeronautics Board regulations, a student pilot is prohibited from flying an aircraft at any time there are passengers aboard.

## III. DISCUSSION

The first issue in this case is whether Harry Johnson was negligent and if so, whether his negligence was a proximate cause of the loss. The record shows that Johnson was in charge of the planning and execution of the flight. In my view, his planning and execution were negligent. For instance, a reasonable and prudent pilot would not have attempted this long flight along a chain of islands in an ocean with such a small fuel reserve. Given the instrumentation on this plane and the flight path here, a reasonable and prudent pilot would have reversed his course when he was beyond instrument range and land was obnubilated. Although there was some testimony in a deposition by Johnson that he became lost due to unforeseen winds, this testimony, even were I to give it full credence, does not alter my opinion that Johnson's negligence caused the loss of the plane. If there were unforeseen winds, there was no showing that they were unforeseeable, nor that Johnson reacted prudently to them when they arose. Johnson also testified in his deposition that a gas leak developed. In light of the fact that the plane was ditched with some fuel remaining after having been flown for 89% of its estimated maximum flying time, and that Johnson was lost and out of contact with the land at the time, I do not believe that there was a gas leak nor that even if there were a leak, it would have been a proximate cause of the loss of this plane. Thus, plaintiff has sustained his burden of proving that the loss was due to Johnson's negligence. Moss v. Bailey Sales and Service, Inc., 385 Pa. 547, 123 A.2d 425 (1956); Hershey v. Pittsburgh and West Virginia Ry. Co., 366 Pa. 158, 76 A.2d 379 (1950); Huck-Gerhardt Com-

pany, Inc. v. Kendall, 189 Pa.Super. 126, 149 A.2d 169 (1958).

■ Since Johnson was negligent and Johnson's negligence was the proximate cause of the loss of the plane, the next question concerns Dixon Company's liability for this negligence. Dixon Company was in the business of delivering airplanes. Sometimes the president of the defendant company made the delivery himself, sometimes the company hired others to do so. However, the company, not the owners of the planes to be delivered, hired these other pilots. The defendant company was paid fees for the delivery of planes, and its president negotiated pilots' fees with the pilots. The defendant company did not arrange for these pilots to work for and be paid by the owners of the planes, as a broker might. It appears that Johnson, who had delivered several planes under a similar arrangement with Dixon Company, was employed sporadically by Dixon Company. Because Johnson was Dixon Company's agent, Piper delivered the plane to his custody for redelivery to the owner. This type of delivery arrangement is a mutual benefit bailment, and the bailee, Dixon Company, is liable for the loss of the bailed article caused by the negligence of its employee and agent. Hearst Magazines Division of Hearst Corp. v. Cuneo Eastern Press, Inc. of Pa., 293 F.Supp. 824, 829 (E.D. Pa.1968); Metzger v. Downtown Garage Corp., 169 Pa.Super. 384, 82 A.2d 507 (1951); Jackson v. Fort Pitt Hotel, 162 Pa.Super. 271, 57 A.2d 696 (1948); The Comet, 66 F.Supp. 231 (E.D.Pa.1946). Even if it were held that Johnson was a sub-contractor of Dixon, not an employee, Dixon Company would still be liable for its failure to perform its implied bailment contract with Aviation Associates because Dixon entrusted the plane to Johnson. See The Comet, 66 F.Supp. 231 (E.D.Pa.1946).

■ Since James and Joyce Wolyneic are also defendants in this action, it is necessary to decide whether they are also liable for the loss of the plane. It is my view that they are not liable because it does not appear that any effect which the Wolyneics had on the planning and execution of the flight was a proximate cause of the loss. The only change in plans which was shown was a change in the day of the flight by one day. There is no evidence that this change in plan was a proximate cause of the loss. Although James Wolyneic did fly the plane for a short time, Johnson was supervising during this period. At all times he, not Wolyneic, was in control. Not having done anything to override or decrease this control, Wolyneic cannot be charged with joint responsibility for the destruction of the plane. Even if it were assumed that James Wolyneic took some independent action during his brief period at the controls, there was no convincing proof that the loss of the plane was due to the course the plane took while Wolyneic had his hands on the controls.

■ The final issue in this action is the extent of the damages to which plaintiff is entitled. Clearly, plaintiff is due at least the fair market value of the plane on the date of its loss. The more difficult question is whether or not plaintiff may recover interest on this fair market value from the date of the loss. In a diversity suit, a federal Court should follow the law of the forum state on this question. See Herd and Co. v. Krawill Machine Corp., 256 F.2d 946 (4th Cir. 1958), affirmed 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820. The law in Pennsylvania on this subject is not clear. Interest may be denied in bailment actions sounding in tort where the damages are unliquidated. Girard Trust Corn Exchange Bank v. Brink's, Inc., 422 Pa. 48, 220 A.2d 827 (1966). However, it also appears that if the damages can be measured by fair market value or other definite standards, plaintiff may be awarded interest as a compensation for delay in payment. Marrazzo v. Scranton Nehi Bottling Co., Inc., 438 Pa. 72, 263 A.2d 336 (1970); Murray Hill Estates, Inc. v. Bastin et al., 442 Pa. 405, 276 A.2d 542 (1971). Compensation for delay is of an equitable nature and depends

on all the circumstances of the case. Compensation would not be awarded had plaintiff made an excessive and unconscionable demand for payment. The Pennsylvania Supreme Court has not squarely faced the issue of whether to award interest where, as here, defendant in good faith disputes plaintiff's claim. It is my view that because the Pennsylvania Supreme Court awards interest on liquidated damages even where a case sounds in tort, it would also do so where the loss is capable of definite valuation and there are no equities against the plaintiff. In this fashion, plaintiff will be as justly compensated as is practicable. Hence, in this action, Aviation Associates will be awarded interest at the legal rate on the fair market value of the plane from the date of its loss.

## IV. CONCLUSIONS OF LAW

1. This court has jurisdiction under 28 U.S.C. § 1332.

2. The agreement entered into between plaintiff and defendant Dixon Company was an oral mutual benefit bailment contract.

3. Harry J. Johnson was negligent in his planning and execution of the flight.

4. Johnson's negligence was a proximate cause of the loss of the plane.

5. The Dixon Company was a bailee of the plane.

6. When delivering this plane, Johnson was an agent for the Dixon Company.

7. The Dixon Company is liable for the loss of the Piper plane.

8. Any influence which James and Joyce Wolyneic had on the flight in question was not a proximate cause of the loss of the plane.

9. Plaintiff is entitled to recover from the defendant The Dixon Company, Inc. $18,389.84, the fair market value of the plane on the date of its loss.

10. Plaintiff is also entitled to recover from the Defendant The Dixon Company, Inc. $5,192.06 interest from the date of the loss at the legal rate of 6%.

11. Plaintiff is not entitled to recover from either James Wolyneic or Joyce Wolyneic.

An appropriate order will be entered accordingly.