**S.D. WARREN COMPANY d/b/a Sappi Fine Paper North America, Plaintiff**

v.

**EASTERN ELECTRICAL CORP., Defendant**

**No. CIV. 01–31–B–K.**

United States District Court, D. Maine.

Feb. 19, 2002.

John F. Lambert, Jr., Thomas V. Laprade, Esq., Lambert, Coffin, Portland, ME, for Plaintiff.

Laurence H. Leavitt, Friedman, Gaythwaite, Wolf & Leavitt, James M. Bowie, Thompson & Bowie, Portland, ME, for Defendant.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

The parties have filed cross-motions for summary judgment. The plaintiff has moved for summary judgment on Counts II, III, IV, and V of the complaint, the "contract" claims. The defendant has moved for summary judgment on all counts, including Count I, a negligence claim. I **GRANT** defendant's motion relating to Count IV, **GRANT in part** plaintiff's motion as it relates to Counts II and III, and **DENY** the remaining portions of both motions.

### Summary Judgment Standard

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter at law." Fed.R.Civ.P. 56(c). A fact is "material" when it has the "potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A "genuine issue" exists when the evidence is "sufficient to support rational resolution of the point in favor of either party." *Id.* To determine whether genuine issues of material fact exist in matters subject to cross-motions for summary judgment, the court must draw all reasonable inferences against granting summary judgment. *Cont'l Grain Co. v. P.R. Mar. Shipping Auth.*, 972 F.2d 426, 429 (1st Cir.1992). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Statement of Facts

S.D. Warren Company d/b/a Sappi Fine Paper North America ("Sappi"), a paper manufacturing company, operates a pulp and paper mill in Somerset County, Maine. In May of 1999, S.D. Warren hired Eastern Electrical Corporation ("Eastern") to install a governor on a turbine generator at S.D. Warren's paper mill in Hinckley, Maine. As part of this work Eastern was responsible for the installation of a governor cabinet in Electrical Room No.16 at the mill. Gregory True, the Eastern superintendent in charge of the project, had worked at the Somerset mill since 1991. On the morning of May 12, 1999, Steve Perro, S.D. Warren's project engineer who hired Eastern to install the governor, conducted a walk-through of the job site with True and other Eastern employees.

During the May 12 walk-through Perro instructed the Eastern employees to be careful not to hit the Central Maine Power ("CMP") relay panel. Eastern employees were specifically instructed by Perro, and were otherwise aware, that bumping the CMP relay panel could cause the breaker to trip, thereby disconnecting the mill from CMP. Later that day in the process of moving the governor cabinet to its proper location, Eastern employees bumped the CMP relay panel with an eighty-pound dolly while attempting to move the dolly in the space behind the CMP relay panel. The amount of space available for moving equipment in Electrical Room No.16 was limited. The Eastern employee who bumped the panel was William Berube and in a recorded statement on June 11, 1999, Berube said, "I felt that if there was to be

---

1. Pursuant to Federal Rule of Civil Procedure 73(b) the parties have consented to allow the United States Magistrate Judge to conduct any and all proceedings in this matter.

any blame to be placed, it should be me." Berube also gave a written statement on the day of the incident in which he stated as follows: "While moving the hydraulic dolley (sic) behind the main CMP breaker rack, to place in under the new governor cabinet, the dolley (sic) gently bumped into the main rack. This was the cause of the shutdown. It was the side of the dolley (sic) that I was carrying and I take full responsibility. I can't tell you how sorry I am."

Prior to May 12, 1999, the mill had sustained power when disconnected from CMP. Sappi management was aware that many potential events such as lightning strikes, ice storms, brownouts, faults, and disruption of power upstream could cause the mill to lose connection with CMP. Prior to May 12, 1999, the mill had never suffered a mill-wide blackout as a result of a bump to the CMP relay panel. The primary sources of electrical power at the mill are two turbine generators designed to produce more electricity than the mill consumes. At the moment of the inadvertent disconnect from CMP, the mill was creating its own electricity at excess capacity, sending its surplus electricity back to the CMP "grid." The mill and CMP have an interconnected power system whereby the mill generates excess electricity, sells all of its power to CMP, and then buys back what it needs. The mill's power is generated on an internal 115 kV system tied into CMP's "infinite bus."[2] The mill was designed so that in the event of an inadvertent disconnect from CMP it would be able to maintain sufficient electrical production to continue operating. Indeed the mill did continue to operate for approximately fifteen minutes after Berube's misstep.

During the first fourteen minutes after the relay trip a series of events occurred that led to both turbine generators tripping offline and then leaving the mill entirely dark. Within a half-hour after the relay was tripped Sappi representatives reclosed the breaker and reset the subject relays. Neither Eastern employees nor its subsequently retained expert have been able to determine exactly which relays were tripped by Berube's conduct. It took approximately thirteen to seventeen hours to get the mill operating after the incident.

Power was not restored immediately due to a multiplicity of factors. For instance, a load-shedding system, designed to reduce the plant's power consumption, unexpectedly became active despite the fact that two primary steam turbine generators were producing more power than the plant requires at full power consumption. There is also a factual dispute about whether or not one of the turbine generators had been properly commissioned or synchronized at its start up in 1990 and whether this is a factor that contributed to the mill's shutdown through some type of frequency oscillation.

As part of its compensatory damages Sappi is claiming that it lost business income as a result of the loss of production capability. Sappi's expert derived his lost income figures by multiplying the saleable tons that could have been made during the hours the mill was shut down times the average sell price per ton to arrive at the "Sales Value of Lost Production." From this amount Sappi subtracted the savings it realized on "Variable Costs" to arrive at a monetary figure reflecting a portion of its damages in this case. Eastern notes the fact that it is undisputed that Sappi's productivity in May 1999 improved over its April performance by 133 tons per day, despite extended shutdowns.

---

**2.** There is some dissension on this point. However, *see* Jensen Decl. ¶ 3.

In April 1998 an Eastern worker engaged in a job at the mill dropped his hard hat onto a relay panel, causing a power outage and the shutdown of one of the paper machines (not a mill-wide outage). Eastern's insurer compensated Sappi for the production losses it suffered as the result of the time period that the paper machine was down. When asked in his deposition to explain Eastern's payment of the April 1998 hard-hat claim and its refusal to pay the May 1999 claim, Eastern's representative responded, "Dollars." He also cited his belief that Eastern did not cause the May 1999 shutdown.

In August 1995 Sappi and Eastern executed a General Agreement setting forth the terms governing work performed for Sappi by Eastern. The services performed on May 12, 1999, were governed and subject to the terms of the General Agreement. Pursuant to Article 10(A) of the General Agreement Eastern was required to "continuously maintain protection of all the work and property in the vicinity of the work from damage or loss from any cause arising in connection with the contract and work performed thereunder." The same article of the General Agreement also provided that Eastern was required to "indemnify and hold [S.D. Warren] harmless from any claims, suits, losses or expenses, including attorneys' fees, suffered by [S.D. Warren] arising out of injury to any person, including [S.D. Warren's or Eastern's] employees, or damage to any property, including [S.D. Warren's] property, if the injury or damage is caused in whole or in part by [Eastern], or any of [Eastern's] subcontractors, materialmen or anyone directly or indirectly employed or otherwise controlled by any of them while engaged in the performance of any work hereunder."

The General Agreement also contained two provisions regarding insurance. Under Article 10(B) Eastern agreed to obtain liability insurance to protect itself and S.D. Warren from the risk of loss arising in connection with the work performed by Eastern at the facility. Eastern in fact obtained insurance through Acadia Insurance Co. Article 10(C) provided that "[n]otwithstanding any provision of section (B) of this Article, the Owner shall insure against loss by fire and the normal extended coverage perils all of work and the structure or project on or in which the work is to be performed." Article 10(C) further provided that Sappi "waives Owner's right of recovery from Contractor for any fire loss or damage for which the Owner is actually reimbursed under Owner's fire insurance policies." Sappi obtained insurance to cover the risks identified in Article 10(C). Sappi has never filed a claim under its insurance policy for the losses in connection with these events; the policy contains an "inner operating deductible" of $1,000,000.

Two other provisions of the General Agreement bear on this dispute. Article 9 sets forth the owner's powers "to make decisions on all controversies arising out of the contract papers or the refusal of either party to perform any part thereof." The article also contains the following provision: "All decisions and determinations made by the Owner's Representative shall be final and binding on the Contractor unless, within ten (10) days after the Contractor's receipt thereof, written objection is filed with the Owner's Representative demanding that the issue be determined by arbitration as provided in Article 14." Article 16 provides that whenever the contract papers require that one party give notice to the other, such notice shall be given as follows: "If given to the Contractor, by certified mail, return receipt requested."

On June 9, 1999, William Fetterman of Sappi sent a letter to Eastern stating that Sappi had suffered a loss as the result of Eastern's bumping the CMP relay panel and advising Eastern that Sappi was holding Eastern responsible for the total amount of the loss. The June 9, 1999, letter was not sent by certified mail, return receipt requested. Eastern never filed a written objection to the letter with the owner's representative. On October 24, 2000, Sappi sent Eastern a notice of pre-judgment interest and demand for payment under the General Agreement in connection with the May 12, 1999 incident. The record does not contain any indication as to whether this notice was sent by certified mail. Eastern did not make payment as requested and did not make any written response to Sappi's notice and demand until it filed an answer to the current action on April 13, 2001.

### Discussion

Eastern has moved for summary judgment in its favor on all counts and Sappi has moved for summary judgment in its favor on the contract-related matters. Alternatively, Eastern asks me to enter partial summary judgment in its favor on Sappi's damage claim relating to lost business income. I will discuss the contract-related matters first. Article 17 ¶ F of the contract provides that the law of the Commonwealth of Pennsylvania shall govern.[3]

#### A. Count IV—General Agreement Article 9 Waiver

■ In Count IV of the complaint Sappi seeks judgment in its favor under Article 9 of the General Agreement. This article provides that in the event the owner's representative makes a decision and determination under the general agreement the contractor must file written objection with-

in ten days after receipt thereof in order to invoke the binding arbitration clause. According to the contract provision the decision of the representative of the owner on all controversies arising out of the contract is final and binding if written objection is not filed in accordance with this provision.

According to Sappi its June 9, 1999, letter from William Fetterman (Ex. 46) was a decision and determination within the meaning of Article 9 and when Eastern failed to file a written objection to that letter it waived all right to object to Sappi's determinations regarding both liability and damages. Sappi also notes that on January 7, 2000, it sent two identical letters with a copy of its loss calculations to Eastern and its insurer, Acadia Insurance Company. (Exs. 44 & 45.) Finally Sappi points to its October 24, 2000, Notice of Claim (Ex. 58) sent pursuant to 14 M.R.S.A. § 1602 to invoke the benefits of statutory prejudgment interest under Maine law as evidence of its determinations made pursuant to Article 9. It is undisputed that Eastern received all of these communications and never filed a written objection to any of them.

■ A fundamental rule in construing a contract is to ascertain and give effect to the intent of the contracting parties. *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 559 Pa. 56, 739 A.2d 133, 137 (1999). The parties intended the owner's decisions and determinations only to become final and binding if the contractor did not file a written objection within ten days *after receipt thereof.* In order to unambiguously determine when the ten days begin to run the provision has to be read in conjunction with Article 16. This article provides that notice from one party to another under the contract must be by

---

**3.** The parties both agree that Pennsylvania law governs the contract claim. Its applica-

tion to the negligence count is discussed in the context of my discussion of those issues.

certified mail, return receipt and provides "any notice given [by certified mail] shall be conclusively deemed *received* by the other party on the fifth day following the mailing of the said notice." Sappi never sent certified notice of a "decision" or "determination" nor did anything else trigger the contract provisions that would have made its decisions "final and binding" in the absence of a written objection and a demand that the issue be determined by arbitration.

As Sappi argues, the contract has an eloquent simplicity and if Sappi had wanted to trigger Article 9 it could have achieved this. Had it done so Eastern would have been required to file its written objections or the determinations of Sappi would have become final and binding. Article 14 provides that when there is a disagreement about decisions and determinations Eastern may demand arbitration. In that event Sappi's decisions are not final and binding. Fetterman himself reluctantly acknowledged during his deposition that the June 9 letter was not intended to invoke the provisions of Article 9. (Fetterman Dep. at 26—31.) It is undisputed that even before the June letter Sappi knew that Eastern and its insurer disputed liability for this incident and objected to Sappi's damage claims. If Sappi had wanted to avail itself of the speedy and available remedy of arbitration under the contract it should have unambiguously invoked Article 9. To argue now that the June letter can be deemed "final and binding" because Eastern never filed a *written* objection as required by the contract is disingenuous at best. If the June letter fell within the meaning of Article 9 why would Sappi continue to investigate, modify, and reiterate its "decision and determination." If Sappi intended that determination as final and binding it had some minimal obligation to convey its intent to Eastern.

While Article 9 does not specifically state that the owner's decisions and determinations must be sent by certified mail or even that they have to be in writing, they cannot become "final and binding" unless the contractor receives them and fails to make written objections within ten days. The contract in Article 16 provides a method by which receipt can be conclusively established. Sappi did not avail itself of that particular method nor has it generated any factual dispute about employing any other method of putting Eastern on notice that Article 9 had been invoked. Nor has Sappi been able to generate any record evidence to support the proposition that it intended the June letter to become final and binding, let alone that Eastern would have had any reason to interpret the letter in that fashion. Neither party ever intended to invoke Article 9 until after the lawsuit was filed. Judgment should enter for Eastern on Count IV.

### B. Count II—Breach of Article 6 Warranty to Perform in Good and Workmanlike Manner

■ Pursuant to Article 6 Eastern warranted that "all services to be performed shall be performed in a good and workmanlike manner and in accordance with sound generally accepted practices, involve no unreasonable risk of injury or damage, ... and be without fault and free from defects." The standard of care under the warranty is higher than the "normal" negligence standard of care, indeed it is a "without fault and free from defects" standard. Eastern's employee William Berube has admitted that the dolly under his control bumped the CMP relay panel. He also acknowledged that he was aware that the relay panel should not be bumped, he knew there was forty-six-inches of clearance between the stair railing and the CMP relay panel and he thought the clear-

ance sufficient to get the dolly through the admittedly tight space without striking the panel. (*See* Berube Dep. at 25; Ex. 45.) Furthermore it is undisputed that the relevant members of the Eastern crew were warned that very morning about the need to avoid any contact with the CMP relay panel and could have moved the dolly by an alternative route. At the time of the Berube contact one of the Eastern employees saw an arc, and it is undisputed that relays tripped thereafter, causing the circuits to break, leading to the permissible inference that Eastern was responsible for the disconnect from CMP.

Eastern does not dispute that Berube's conduct resulted in an arc from the panel or that the relays were tripped. Eastern disputes that Sappi can prove that Berube's conduct in fact caused the power outage because Sappi does not have an expert witness who can say precisely how the outage occurred. Eastern also argues that its own expert was hampered in making determinations about causation because Sappi employees reset the relay panel without regard to preserving exactly which relays had been tripped. However, Eastern's deposition testimony was that it had no reason to deny that the bump of the panel caused the breaker to open. (Bradbury Dep. at 20.) Furthermore, during the deposition of Robert Dorko the witness identified a document that lists flags on the relay panel that tripped on May 12. (Dorko Dep. at 33.) That Eastern caused the disconnect from CMP does not appear disputed on these facts. The disconnect from CMP, in turn, was at least a partial cause of the "blackout." Although Eastern says that its expert was hindered in making that causation determination based upon which relays were tripped it has provided no record evidence that supports that argument. While Eastern has developed record evidence about potential other intervening causes for a

power outage of this magnitude, Sappi has generated enough undisputed evidence to establish as a matter of law that the CMP disconnect caused, at least in part, the mill-wide blackout.

Based upon this analysis, I am satisfied that Sappi is entitled to partial summary judgment on Count II on the issue of breach of the warranty to perform in a workmanlike manner provision. Reserved for trial is the factual question of the contributory negligence, if any, of Sappi and the extent of the damages.

### C. Counts III and V—Article 10 Breach of Contract Agreement to Indemnify and Promise to Insure

█ The claims in Counts III and V arise under Article 10(A) and (B) of the General Agreement. Section (A) provides in pertinent part, "[t]he Contractor [Eastern] shall indemnify and hold [Sappi] harmless from any claims, suits, *losses* or *expenses,* . . . suffered by the Owner arising out of . . . damage to any property, *including* [Sappi's] property, if the injury or damage is caused *in whole or in part* by the Contractor [Eastern]." (Ex. 50 at 9 (emphasis added).) Section (B) required Eastern to maintain property damage insurance in the amount of at least 1,000,000 dollars single limit per occurrence. The section provides that the purpose of the promise to obtain insurance is to protect both Sappi and Eastern from the risks described in section (A), i.e., the risk of losses or expenses arising out of damage to Sappi's own property, if caused in whole or in part by Eastern.

Eastern attempts to argue away these provisions by directing my attention to section (C) of Article 10. Section (C) provides: "Notwithstanding any provision of section (B) of this Article, [Sappi] shall insure against loss by fire and the normal

extended coverage perils[4] all of work and the structure or project on or in which the work is to be performed." The paragraph continues by stating that Sappi waives its right of recovery from Eastern for "any fire loss or damage for which [Sappi] is actually reimbursed under [Sappi's] fire insurance policies." From this contract language Eastern constructs an argument that because Sappi obtained some type of insurance coverage for its mill and never presented a claim to its insurer for this loss, not caused by fire, it has waived its right to indemnification under the contract. Eastern expands this argument by citing to a Maine case which holds that an owner's obligation in a construction contract to purchase property insurance implicitly reflects the intent of the parties that the procurement of the insurance was for the mutual benefit of both parties and is not contrary to a public policy. *Acadia Ins. Co. v. Buck Const. Co.*, 2000 ME 154 ¶ 18, 756 A.2d 515, 520.[5]

The significance of the reasoning of *Acadia Insurance Co.* in relationship to this case is that the parties to a contract are able to choose to allocate risks associated with the work under the contract and to divide the responsibility for procuring insurance against those risks. By agreeing to carry "a *particular type* of insurance, an owner has agreed to look solely to the insurer and releases the builder from re-sponsibility when there is loss or damage flowing from the insured risk; because the insurer can only succeed to those rights possessed by its insured, it has no right to recover from the [contractor]." 2000 ME 154, ¶ 17, 756 A.2d at 519 (emphasis added). To determine precisely how the parties have chosen to allocate risks, one looks to the language of the particular contract.

Article 10 sets forth in three straightforward paragraphs how the risk of loss will be allocated. In section (A) Eastern agreed to indemnify Sappi not only in actions involving third parties, but also for any damage to Sappi's own property *caused in whole or in part* by Eastern. In section (B) Eastern agreed to obtain liability insurance to effectuate the purpose of section (A), in certain minimum amounts, but acknowledged that its obligation to indemnify was not limited by the amount of its insurance policies. In section (C) Sappi agreed that it would obtain fire insurance and "the normal extended coverage perils," and indicated that it waived its right of recovery from Eastern for any *fire* loss or damage.

Clearly it is implicit in the language of the contract that if Sappi suffers a fire loss at the mill, caused in whole or in part by Eastern's breach of performance under the contract, Sappi has an obligation to make a claim under its fire insurance policies. However, if there has been no fire loss, the

---

4. The parties have not offered an explanation of the meaning of "normal extended coverage perils" but it appears that under Pennsylvania's Insurance Code the "Standard Fire Insurance Policy" means loss by fire, lightning, or removal. 40 Pa. Cons.Stat. § 636(1). Extended coverage means something additional. I have no idea if the loss described in this case is within the "normal extended perils of coverage." In any event the contract language clearly states that the section C insurance subrogation waiver by the owner pertains to reimbursement for *fire* loss. There was no fire.

5. Admitting that the case law is "limited," the defendant proffers two Pennsylvania cases as standing for the proposition that wavier provisions in contracts are favorably viewed by the Pennsylvania courts: *Penn Avenue Place Associates v. Century Steel Erectors, Inc.*, 45 Pa. D. & C. 4th 260, 266 (2000) and *Hearst Magazines v. Cuneo Eastern Press, Inc.*, 293 F.Supp. 824 (E.D.Pa.1968). I agree that these cases do not forcefully support this proposition. Both parties discuss *Acadia Insurance Co.* on this point, and I follow suit.

provision has no applicability. Pursuant to Article 10 Sappi is entitled to be reimbursed for any damage "caused in whole or in part" by Eastern.

■ It is easy enough to understand the "caused in whole or in part by the Contractor" language in the situation where a third party is also partially responsible for damage. The indemnification clause spells out that the parties have agreed that Eastern will indemnify Sappi for all damages and then Eastern presumably would be free to recover from the third party. What the indemnification clause does not quite so clearly spell out is Eastern's responsibility when Sappi is itself negligent and causes damage to its own property. Sappi contends that the contract contemplates Eastern will be entirely responsible for all damage, including any portion of the damage caused by Sappi's own negligence.

■ Indemnification [6] clauses under Pennsylvania law require closer analysis than Sappi chooses to apply. Indeed the case cited by Sappi for the proposition that Pennsylvania courts approve contract provisions indemnifying a party for its own negligence, *Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.*, 1993 WL 367051, * 3 (E.D.Pa.1993) *aff'd on rehearing*, 1994 WL 116108 (1994), involves a Federal court's application of the well-established *Perry–Ruzzi* rule. Pursuant to the *Perry–Ruzzi* rule a party who seeks to indemnify itself against its own negligence must do so pursuant to a contract term that is clear and unequivocal. *See Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 588 A.2d 1, 4 (1991) (reaffirming *Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907)). *See also Topp Copy Prod., Inc. v. Singletary*, 533 Pa. 468, 626 A.2d 98, 101 (1993) (distinguishing com-

mercial lease for real property from indemnification contract and noting, "*Perry* and *Butler* apply the general principle that the exculpatory language must be expressed in clear and unequivocal terms. In contracts of indemnity, this principle is applied with a force that requires the parties to state in express terms that the active negligence of the indemnitee will be assumed by the indemnitor.").

■ In *Kiewit Eastern Co.* the indemnification clause read in its entirety as follows:

> Section 11. INDEMNIFICATION. The Subcontractor further specifically obligates itself to the Contractor, . . . in the following respects, to wit: (b) to defend and indemnify [contractor] against and save [contractor] harmless from any and all claims, suits or liability for . . . injuries to persons. . . on account of acts or omissions of Subcontractor. . . whether or not caused in part by the active or passive negligence or other fault of [contractor]; provided, however, Subcontractor's duty hereunder shall not arise if such claims, suits or liability, injuries or death or other claims or suits are caused by the sole negligence of [contractor]. Subcontractor's obligation hereunder shall not be limited by the provisions of any Workers' Compensation act or similar statute[.]

1994 WL 116108, at *2. Sappi's interpretation of the indemnification clause in its own contract runs afoul of the *Perry–Ruzzi* rule in one important respect. Nowhere in the contract is there any language whereby Eastern assumes responsibility for Sappi's negligence (i.e., the "whether or not caused in part by the active or passive negligence or other fault of [contractor]" language of the *Kiewit* contract).

---

**6.** The parties in this case, as in *Acadia Insurance Co.*, have blurred the distinction between indemnification clauses and waivers of subro-

gation. *See* 2000 ME 154, ¶ 18, 756 A.2d at 520.

As the *Kiewit Eastern Co.* court acknowledges in its order on reconsideration, Pennsylvania law does not favor an interpretation of indemnification clauses in such a manner as to place the indemnitor in the position of a general liability insurer, especially for the negligence of the indemnitee. *Id.* at \*4.

Given the applicability of Pennsylvania law to this contract and the actual language of the indemnification clause, I am persuaded that Eastern can assert Sappi's own negligence as a bar to recovery under the clause. While the undisputed facts establish that Eastern caused the relay panel to trip, the issue of whether the mill-wide blackout was also caused in part by Sappi's own negligence is disputed. (Def.'s Statement Material Facts ¶¶ 48—67; Pl.'s Resp. Def.'s Statement Material Facts ¶¶ 48—67.) Therefore to the extent that Eastern can prove that Sappi's own negligence caused the mill-wide black out, Eastern would not be responsible under the language of this indemnity clause. Thus, while Sappi is entitled to partial summary judgment on Count III of the complaint, there is nothing in this record to support the entry of judgment for Sappi on the indemnification clause in Count V because there is currently no record evidence that Eastern did not obtain insurance against all risks other than fire as required by the indemnity language of the contract.

### D.  *Count I—Negligence*

██  Only Eastern has moved for summary judgment on Count I, arguing that it is entitled to judgment as a matter of law because Sappi cannot prove that its negligence, if any, was a proximate cause of damage. As indicated above, Eastern is not entitled to judgment as a matter of law on its causation theory merely because Sappi does not have an expert witness. There are genuine issues of material fact in dispute as to whether Eastern was negligent and whether Sappi's own negligence contributed to the injury.

A preliminary choice of law issue, not raised in the briefs of either party, arose in connection with this count. While at first blush it would appear obvious that Maine law governs this tort claim, I was particularly concerned about the applicability of Pennsylvania law to this count in light of the so-called "gist of the action" doctrine. *See Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 651 (W.D.Pa.1999)(noting that "Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in tort or contract"). Pennsylvania courts have gone as far as to say that negligent performance of a contract term sounds in contract not in tort. *See Brickman Group Ltd. v. CGU Ins. Co.,* 2001 WL 1736482, 53 Pa. D. & C.4th 71 (2001) (listing Pennsylvania cases applying the doctrine in various contexts). Therefore I asked the parties to file supplemental briefs addressing this issue.

Both sides agree, as do I, that in a diversity action such as this one, a federal court should look to the choice of law rules of the forum state. *Adams v. Rubin,* 964 F.Supp. 507 (D.Me.1997). In some ways that solution begs the question, because the real question is whether I should look to Maine's choice of law rules as they relate to contract actions or its choice of law rules relating to tort actions. If I choose the former, I then must confront the question of whether Pennsylvania's "gist of the action" rule bars this count; if I choose the latter then under Maine's choice of law rules it appears that the action would be governed by Maine negligence law. *Id.* at 509. While the negligence count is framed as a separate count, I think it is a close question whether Sappi

has alleged anything other than a negligent failure to perform under the contract. Be that as it may, both sides are in agreement that Maine tort law should govern Count I. In the absence of any clear authority barring the applicability of Maine's law of negligence to Count I, I will apply it and deny Eastern's motion for summary judgment on that count. Although I have already ruled as a matter of law that Eastern has breached the contractual warranty of workmanlike performance, that standard, as Sappi recognizes, differs from the reasonable-care standard of negligence and that issue as well as the affirmative defense issues arising under a claim of negligence must be tried by a factfinder.

### E. Extent of Damages

As a final matter Eastern has moved for judgment as a matter of law on so much of Sappi's claim as seeks damages for lost business income. Eastern does not dispute that loss of business income is recoverable as an element of damage if its employees caused the mill-wide shutdown. It does dispute that Sappi's expert, A.J. Geiling, used the proper methods to compute the amount of the loss. In essence Eastern contends that Sappi will be unable to prove any actual lost sales on account of this seventeen-hour shutdown and that therefore its claims for lost business income are greatly inflated. Sappi, on the other hand, contends that the evidence will support its theory that the loss of production capability ultimately resulted in the loss of sales because all inventory was sold off by September 1999. (Def.'s Statement Material Facts ¶¶ 68 –85; Pl.'s Resp. Def.'s Statement Material Facts ¶¶ 68 – 85.) I am satisfied that factual questions remain about the extent of the lost business income.

### Conclusion

Summary judgment is **GRANTED** to the defendant, Eastern Electrical Corp.,

on Count IV. Partial summary judgment is **GRANTED** to the plaintiff, Sappi, on Counts II and III in that I find as a matter of law that Eastern has breached the contract terms relating to its warranty to perform in a workmanlike manner and has caused, at least in part, damage to Sappi. In all other respects both motions are **DENIED**.